IN THE DISTRICT COURT OF APPEAL
FIRST DISTRICT, STATE OF FLORIDA

ROBERT E. BANKS,

      Petitioner,

v.

JULIE L. JONES, SECRETARY,
FLORIDA DEPARTMENT OF
CORRECTIONS,

      Respondent.

_____/

NOT FINAL UNTIL TIME EXPIRES TO
FILE MOTION FOR REHEARING AND
DISPOSITION THEREOF IF FILED

CASE NO. 1D15-0330

Opinion filed July 12, 2016.

Amended Petition for Writ of Certiorari - - Original Jurisdiction.

Michael Ufferman of Michael Ufferman Law Firm, P.A., Tallahassee, for Petitioner.

Kenneth S. Steely, General Counsel, Department of Corrections, Tallahassee; Pamela Jo Bondi, Attorney General, Susan A. Maher, Chief Assistant Attorney General, Lance Eric Neff, Senior Assistant Attorney General, Sean W. Gellis and Daniel A. Johnson, Assistant Attorneys General, Tallahassee, for Respondent.

EN BANC

B.L. THOMAS, J.

Petitioner is a state prisoner assigned to Close Management residential status for spitting in the face of a psychiatrist attempting to interview him. The Department form reporting the incident stated that Petitioner repeatedly cursed the doctor and staff, and when ordered to leave the doctor's office, Petitioner then

stood up and spat in the doctor's face, requiring Department security staff to escort Petitioner out of the office and place him in confinement pending resolution of the incident. Based on the incident, a disciplinary report was filed against Petitioner, and a referral for Close Management assignment was issued. Close Management is a prison classification imposing more restrictive conditions promulgated to ensure institutional order and safety in Department of Corrections' facilities. Petitioner challenged his assignment to Close Management by filing a petition for writ of habeas corpus.

Claims filed by state prisoners challenging Close Management classification do not assert that the inmate is entitled to release from incarceration but only assert a right to remain in the prison's general population; therefore, such claims do not implicate a constitutionally-protected liberty interest. Because our prior decisions holding to the contrary relied on an analytical foundation built on Hewitt v. Helms, 459 U.S. 460 (1983), rejected more than 20 years ago by the United States Supreme Court in Sandin v. Conner, 515 U.S. 472 (1995), and because habeas corpus review of such claims does not accord the proper deference due the Executive Branch, which must carry out the daunting and dangerous task of ensuring the safety of state prisons, we recede from prior decisions of this court which hold that challenges to Close Management housing assignments may be asserted by petition for writ of habeas corpus. See Magwood v. Tucker, 98 So. 3d

2

725 (Fla. 1st DCA 2012) (holding that prisoner's challenge to Close Management classification, based on disciplinary report which was challenged by petition for writ of mandamus in the Circuit Court for Leon County, must be considered by petition for writ of habeas corpus in the Circuit Court for Santa Rosa County in which prisoner was incarcerated); Kendrick v. McNeil, 6 So. 3d 657 (Fla. 1st DCA 2009) (citing precedent dating back to 1987 holding that circuit court improperly treated claims challenging Close Management classification as arising in mandamus rather than habeas corpus, and ordering that liens placed on inmate's account be refunded, as no fee could be charged for filing petition for writ of habeas corpus, but otherwise denying certiorari relief); Thompson v. Dugger, 509 So. 2d 391, 392 (Fla. 1st DCA 1987) ("Although an inmate has no constitutional due process right to notice and a hearing before his confinement status is changed, such right may be created by state law.").

We now hold that a prisoner's claim that he has been improperly assigned to Close Management classification does not state a claim for relief by writ of habeas corpus under Article I, section 13 of the Florida Constitution or under the Due Process Clause of the Fourteenth Amendment to the United States Constitution. Thus, we hold that such a claim can only be considered by petition for writ of mandamus, asserting that the Department has not complied with its own Close Management procedures and filed in the Second Circuit Court in Leon County, as

3

are other claims challenging disciplinary reports issued in state prisons. See generally Holcomb v. Dep't of Corrections, 609 So. 2d 751 (Fla. 1st DCA 1992) (holding that circuit court must first evaluate a prisoner's petition to determine sufficiency of allegations, and if insufficient, court may deny relief or dismiss insufficient claims; where petition alleges sufficient claims, court must issue order to show cause why requested relief should not be granted, and once issued, order to show cause "becomes in all respects the complaint," and response must admit or deny factual allegations); see, e.g., State ex. rel. Haley v. Groose, 873 S.W.2d 221, 223 (Mo. 1994) (treating petition for writ of habeas corpus challenging placement in protective custody for refusing to submit to DNA testing as petition for writ of mandamus, ordering prison to conduct review hearing, and noting that because prisoner's claim failed to allege cruel and unusual punishment, "habeas corpus is not available to attack the conditions of his confinement"). Further review of circuit court orders in cases involving challenges to Close Management assignment shall be by second-tier certiorari review in this court. Sheley v. Fla. Parole Comm'n, 720 So. 2d 216 (Fla. 1998); Plymel v. Moore, 770 So. 2d 242 (Fla. 1st DCA 2000). In addition to our holding today, we also certify conflict with the Fifth District Court of Appeal in Holland v. State, 791 So. 2d 1256 (Fla. 5th DCA 2001), which cites prior decisions of this court from which we now recede.

4

## *Background*

Petitioner is serving a 30-year prison sentence for his conviction of robbery. While serving his prison sentence, he received a disciplinary report for the actions noted above. The Department of Corrections (the Department) found Petitioner guilty of Department rules, placed him in disciplinary confinement, and revoked 364 days of gain time. In addition, the Department issued a referral which reassigned Petitioner to Close Management I housing classification and removed him from the general population, based on committing an act "causing injury or an act which could have resulted in injury to another." After Petitioner challenged the referral, asserting that the reassignment did not comply with Department rules, the Department conducted a multi-step review, first considering Petitioner's arguments at the institutional level and culminating in final review by the State Classification Officer in Department headquarters. Affirming the institutional staff's referral, the State Classification Officer upheld the decision which assigned Petitioner to Close Management I housing, based on Petitioner's act "which could have resulted in injury to another."

In his petition for writ of habeas corpus filed in the Eighth Judicial Circuit, Petitioner essentially argued that he could not be assigned to Close Management I housing, citing Johnson v. State, 858 So. 2d 1071 (Fla. 3d DCA 2003), which held that spitting in a law enforcement officer's face was not a forcible felony involving

5

violence as defined under the Prison Releasee Reoffender Act. Petitioner never denied the underlying act of spitting in the victim's face. Petitioner cited authorities from the United States Supreme Court and this court, asserting that because he had a liberty interest in remaining in the general prison population, due process required the circuit court to overturn the Department's administrative action assigning him to Close Management I housing by issuing a writ of habeas corpus, ordering that Petitioner be "released" back into the general population of the prison.

The circuit court denied relief without requiring a responsive pleading from the Department, stating in its order:

> . . . Petitioner has failed to demonstrate that he is entitled to due process protection in regard to the Department's decision to place him . . . in [Close Management]. Nothing in the record demonstrates that Petitioner has a protected liberty interest in remaining free from a [Close Management] custody classification. [The Department's] decision to place Petitioner in a particular confinement classification is a discretionary one that is necessary to maintain the order of the institution and the safety of the inmates and staff. The conditions of confinement in [Close Management] fall within the expected parameters of Petitioner's court-imposed prison sentence, and do not impose an "atypical or significant hardship" on Petitioner "in relation to the ordinary incidents of prison life." *See Sandin v. Conner,* 515 U.S. 472, 483-86 (1995).

> Moreover, [Close Management] supervision is not the same as disciplinary confinement and is not imposed as a penalty for a disciplinary infraction. Close management is a tool utilized by corrections personnel to maintain security and order in the institution and to facilitate effective management of the institution. *See* F.A.C. 33-601.800(3)(a). Petitioner has failed to demonstrate that [the

6

Department] abused its discretion in finding that his current [Close Management] classification status appropriately addressed potential security concerns stemming from his behavior.

This Court finds that Petitioner has failed to assert a prima facie case for a writ of habeas corpus.

To challenge the circuit court's ruling, Petitioner sought a writ of certiorari in this court. Pursuant to this court's order, the clerk of the circuit court was directed to transmit the record of the proceedings, and because the order below denied a petition for writ of habeas corpus, we directed that "petitioner is entitled to preparation of the record on appeal without charge." This court further ordered the Secretary of the Department to show cause why the petition for writ of certiorari should not be granted.

This court subsequently ordered this case to be heard en banc regarding "whether the court should recede from decisions holding that an inmate seeking release from close management into the general prison population is entitled to proceed through a petition for writ of habeas corpus. See, e.g. Kendrick v. McNeil, 6 So. 3d 657 (Fla. 1st DCA 2009)." Counsel was appointed by the court to represent Petitioner.[1] This court struck all previous pleadings filed by the parties

_____

[1] Michael Ufferman, appointed by this court, was assisted in the research provided in his brief by Lance Stephens, a second-year law student at The Florida State University College of Law. This court acknowledges the excellent representation provided by Mr. Ufferman on behalf of the Petitioner.

to allow Petitioner and the Department to address the question presented on en banc review.

*Analysis*

## 1. Close Management Classification and Procedures

Close Management is a prison classification that confines a state prisoner "apart from the general population, for reasons of security or the order and effective management of the institution, where the inmate, through his or her behavior, has demonstrated an inability to live in the general population without abusing the rights and privileges of others." Fla. Admin. Code. R. 33-601.800(1)(d). The most restrictive level of Close Management is CM I, which places an inmate in single-cell housing; the least restrictive level is CM III. Varying restrictions of an inmate's privileges and custodial status apply in the classification.

When assigned to Close Management housing, the inmate is visited regularly by Department staff, and irregularly by other staff, to ensure the inmate's safety and health. Fla. Admin. Code. R. 33-601.800(15). Daily visits are conducted by medical personnel, the institution's housing supervisor, and the officer supervising the correctional staff; weekly visits are conducted by the warden and assistant wardens, the security chief, and a classification officer. A Chaplain also visits weekly, and can visit more often if requested and if the

8

Chaplain's schedule permits.

Close Management inmates may possess certain personal items, including hygiene items, electronic devices for listening to music, religious literature, personal property that does not pose security risks, writing paper, stamps, envelopes, and security pens to facilitate correspondence. Close Management inmates may conduct their legal affairs, have access to approved reading material and borrow library books, subscribe to magazines and newspapers, and use in-cell education and wellness opportunities. If the Close Management inmate does not violate a significant institutional rule, they may conduct bank transactions and order from the canteen. Fla. Admin. Code. R. 33-601.800(10)(g).

Close Management inmates may have visitors by appointment. In addition, they are allotted six hours of outdoor exercise each week. Inmates assigned to CM II and CM III may obtain work assignments. Fla. Admin. Code. R. 33-601.800(10)(m) & (13). To provide incentive for improved behavior, privileges may increase as the inmate progresses to more lenient Close Management status. Fla. Admin. Code. R. 33-601.800(11).

The Department's decision to assign an inmate to Close Management is administrative, involving multiple internal decisions by the Department, with each requiring oversight. First, a member of the institution's Classification Team recommends such placement. Fla. Admin. Code R. 33-601.800(3)(c). The

9

Classification Team then reviews this recommendation and conducts a mental health assessment before making a recommendation to the State Classification Officer at the Department's central office in Tallahassee. Fla. Admin. Code R. 33-601.800(3)(g). The State Classification Officer reviews inmate classification decisions, and may modify or reject the Classification Team's recommendation. Fla. Admin. Code. R. 33-601.800(1)(q). Even if the State's Classification Officer approves the Close Management assignment, the Department's internal review continues.

During the first 60 days of Close Management, the inmate's placement is reviewed weekly by a member of the institution's Classification Team; following that, review is monthly. Fla. Admin. Code. R. 33-601.800(16)(a). After six months, the inmate's Classification Officer interviews and assesses the inmate, the previous placement decision, and whether a change in status is advisable. Fla. Admin. Code. R. 33-601.800(16)(c). In addition, the State's Classification Officer interviews the inmate no less often than every six months to determine whether the status remains appropriate or must be modified, including whether the inmate should be reassigned to the general population. Fla. Admin. Code R. 33-601.800(16)(e).

## 2. Judicial Review of Close Management Inmate Assignments

Petitioner asserts that this court should quash the lower court's order

10

denying the petition for writ of habeas corpus and order that the Department reassign him to the general prison population. Petitioner argues that this court should not recede from its decisions allowing prisoners to challenge decisions of the Department assigning inmates to Close Management through a petition for writ of habeas corpus.

As Petitioner asserts in his petition, the ultimate question at issue is whether "placement in close management represents substantially more 'atypical and significant hardships' in relation to the ordinary incidents of prison life," thus entitling an inmate to due process, a violation of which may be asserted by petition for a writ of habeas corpus. To answer this question, we first consider important foundational principles regarding challenges to decisions by prison officials to manage and ensure the safety of prisons.

First, we recognize that courts must give great deference to prison officials who must carry out the dangerous task of managing prisons. The United States Supreme Court has long recognized that

> [r]unning a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint.

11

Turner v. Safley, 482 U.S. 78, 84-85 (1987).  Most pertinent to our decision here is the initial question of whether prisoners in Florida have a protected liberty interest in remaining in the general population, thus necessitating a determination of whether a decision removing a prisoner from the general population for reassignment to Close Management implicates due process requirements.  See Sandin v. Conner, 515 U.S. 472 (1995).  If an inmate has no such liberty interest implicating due process demands, then it is more logical for this court to reevaluate its prior case law holding that judicial challenges to assignments to Close Management sound in habeas corpus rather than by writ of mandamus.  If a liberty interest is not at stake, judicial review of the Department's decision to assign an inmate to Close Management would be more appropriately considered as an appeal of an administrative decision, rather than a claim that a person is being illegally detained, and thus entitled to assert a claim by writ of habeas corpus.

In Sandin, the United States Supreme Court addressed whether a state prisoner incarcerated in the Hawaiian Department of Corrections possessed a liberty interest to remain free from disciplinary confinement and thus possessed a right to the federal Due Process Clause procedural requirements of Wolff v. McDonnell, 418 U.S. 539 (1974).  Sandin, 515 U.S. at 474.  Hawaiian inmate DeMont Conner was a state prisoner serving a sentence of 30 years to life for numerous state crimes including murder, kidnapping, burglary, and robbery.  Id. at

12

475. While in prison, Conner was charged with misconduct for using abusive language when prison officials conducted an intrusive search of his person. Id. During the disciplinary hearing, prison officials refused Conner's request to call witnesses, citing their unavailability. Id. Conner was found guilty and assigned to 30 days of "disciplinary segregation." Id. at 475-76. An official later granted Conner's internal appeal and deleted the charge after Conner had served the confinement period. Based on the prison official's actions, Conner filed suit under 42 United States Code Annotated section 1983 in the District Court of Hawaii. The district court granted the State's motion for summary judgment, but the Ninth Circuit Court of Appeals reversed. Conner v. Sakai, 15 F.3d 1463 (9th Cir. 1993). Relying on the United States Supreme Court decision in Hewitt, the Ninth Circuit held that Conner had a liberty interest in remaining in the general population and had raised a genuine issue of material fact under Wolff by adequately alleging Hawaiian prison officials had failed to accord him the opportunity to call witnesses. Id. at 1466-67.

In reversing the Ninth Circuit, the United States Supreme Court overruled its prior precedent in Hewitt and its progeny in which the Court looked to state law or mandatory administrative regulations to consider whether the State had created a constitutionally-protected liberty interest, triggering due process requirements. Instead, the Supreme Court announced that "these [liberty] interests will be

13

generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes **atypical and significant hardship on the inmate** in relation to the ordinary incidents of prison life." Sandin, 515 U.S. at 484 (citations omitted; emphasis added). The Court left open the possibility that states could create liberty interests which triggered due process protections, such as in Board of Pardons v. Allen, 482 U.S. 369 (1987), where the state's mandatory language regarding parole eligibility established such a liberty interest, and it recognized that, as in Washington v. Harper, 494 U.S. 210 (1990), some prison regulations authorized involuntary administration of anti-psychotic medication, or Vitek v. Jones, 445 U.S. 480 (1980), which authorized involuntary transfer of a state prisoner to a mental hospital, in which such unusual prison regulations, by their very nature, invoked due process protections. But the decision in Sandin clearly announced that any prison regulation which did not impose an atypical hardship on state prisoners would not implicate due process protections, and that a state prisoner's interest in avoiding more adverse prison consequences was expected to occur following a lawful conviction and sentence, and was not to be equated with state laws addressing "rights and remedies available to the general public." Sandin, 515 U.S. at 481.

14

The Supreme Court anchored its new approach to state prisoner due process claims on issues of "real substance" rather than on prison regulations designed to help guide correctional staff. In its overview of prior precedent, the Court noted that in Meachum v. Fano, 427 U.S. 215 (1976), it recognized that state prisoners who were transferred to a more secure prison with "less favorable" conditions did **not** implicate substantive due process liberty interest rights: "The Court began [in Meachum] with the proposition that the Due Process Clause does not protect every change in the conditions of confinement having a **substantial adverse impact** on the prisoner." Sandin, 515 U.S. at 478 (emphasis added).

The Sandin Court then turned to Hewitt, noting that even in that decision, the Court did not find a liberty interest implicated in a state prisoner's right to remain in the general population: "[the Hewitt Court] then concluded that the transfer to less amenable quarters for nonpunitive reasons was 'ordinarily contemplated by a prison sentence.'" Sandin, 515 U.S. at 480 (quoting Hewitt, 459 U.S. at 468). But the Sandin Court held that its prior methodology for determining the existence of a liberty interest used in Hewitt was logically flawed, as it looked to the prison regulations themselves, rather than whether the prisoner's confinement in administrative segregation actually imposed a "'grievous loss of liberty' retained even after sentenced to terms of imprisonment." Id. (citing Morrissey v. Brewer, 408 U.S. 471, 481 (1972)). In other words, unlike Morrissey,

15

which involved the revocation of parole, a real deprivation of actual liberty, the Sandin Court criticized its earlier precedent in Hewitt, which focused on the nature of the prison regulation rather than the question of whether there was an actual loss of liberty.

Thus, under the logic of Sandin, it is unlikely that Petitioner's claim that he was wrongfully assigned to Close Management implicates a substantive due process liberty interest, primarily because Close Management does not, on its face, constitute a "grievous loss of liberty," as a prisoner sentenced to 30 years' imprisonment has already lost his or her liberty. In addition, as enforced today, removing a prisoner who has committed a disciplinary infraction from the general population is not an "atypical and significant hardship" of normal existence in prison. In fact, such an assignment is not dissimilar to a transfer from a less-secure to a more-secure institution, where a prisoner must adapt to more burdensome and strict living conditions. To quote the United States Supreme Court, "Discipline by prison officials in response to a wide range of misconduct falls within the expected perimeters of the sentence imposed by a court of law." Sandin, 515 U.S. at 485.

As noted, the Supreme Court in Sandin rejected the logic of Hewitt, which found that state prison regulations, much like those involved here, established a protected liberty interest. The Sandin Court unequivocally held that such regulations are laudatory and cannot be used against the state to require it to meet

16

more stringent procedural requirements before taking punitive action to confine a disorderly prisoner away from the general population:

> Hewitt has produced at least two undesirable effects. First, it creates disincentives for States to codify management procedures in the interest of uniform treatment. Prison administrators need be concerned with the safety of the staff and inmate population. Ensuring that welfare often leads prison administrators to curb the discretion of staff on the front line who **daily encounter prisoners hostile to the authoritarian structure of the prison environment. Such guidelines are not set forth solely to benefit the prisoners.** They also aspire to instruct subordinate employees how to exercise discretion vested by the State in the warden, and to confine the authority of prison personnel in order to avoid widely different treatment of similar incidents. The approach embraced by Hewitt discourages this desirable development: States may avoid the creation of "liberty" interests **by having scarcely any regulations, or by conferring standardless discretion on correctional personnel**.

> Second, the Hewitt approach has led to the involvement of federal courts in the day-to-day management of prisons, often squandering judicial resources **with little offsetting benefit to anyone**.

Sandin, 515 U.S. at 482 (emphasis added). Both of these logical observations made by the United States Supreme Court in 1995 support our decision today to recede from prior decisions which allow Close Management decisions to be challenged by writ of habeas corpus, which encourages excessive state judicial oversight and interference with prison management, without any real substance at stake or real benefit conferred on state prisoners while creating a risk of diminishing state prison security and safety.

17

In 1987, this court relied on the logic of Hewitt in discussing why a claim challenging assignment to Close Management would be properly heard in habeas corpus. In Thompson v. Dugger, 509 So. 2d 391 (Fla. 1st DCA 1987), we stated: "Although an inmate has no constitutional due process right to notice and a hearing before his confinement status is changed, such right may be created by state law." 509 So. 2d 391, 392 (Fla. 1st DCA 1987) (citing Hewitt). This court granted the writ of habeas corpus and required an evidentiary hearing in the circuit court, based on the Department's own internal rules regarding the notice to be provided to the inmate. Thus, this court held that the Department's internal rules created a right to due process before the inmate could be assigned to Close Management. While its logic was not explicit, this court's decision in Thompson was, by necessity, based on the principle that because the State had created a liberty interest in remaining in the general population, by the Department's rules, the inmate was entitled to assert a **constitutional** claim that was properly heard by writ of habeas corpus. This purported constitutional claim required an evidentiary hearing to determine whether the inmate's rights, created by state law, had been protected. Of course, if there is no right to remain free from Close Management, then the underlying premise of Thompson was flawed.

This court previously followed this same logic in Granger v. Florida State Prison, 424 So. 2d 937 (Fla. 1st DCA 1983), where we held that a prisoner

18

possessed a liberty interest, created by state law, in remaining in the general population; thus, the prisoner was entitled to a writ of habeas corpus to challenge the Department's alleged failure to follow its internal rules. Interestingly, the Department argued in Granger, to no avail, that the prisoner did not have a liberty interest:

> [W]e reject the State's contention that the denial of Granger's petition should be affirmed on the ground that he has failed to assert a sufficient liberty interest. While it is true that due process attaches only to those rights created by the State, it cannot be said that the State has not created a liberty interest in being free from arbitrary transfers from the general prison population to administrative segregation. *See Parker v. Cook,* 642 F.2d 865 (5th Cir. 1981); and section 33-3.081, Fla. Admin. Code.

424 So. 2d at 938. But we hold today that the Department's position was correct. The Department did not "create" a protected substantive liberty interest under the federal Due Process Clause, or state constitutional provisions, by simply enacting rules that guide its decision to confine prisoners in Close Management, based on misconduct that threatens the safety and security of the prison's staff, other inmates, and visitors.

We now recognize that prisoners do not possess a constitutionally protected substantive liberty interest in remaining in the general population, either under the terms of the federal Due Process Clause or in the Close Management regulations enacted by the Department itself. As the Supreme Court recognized in Sandin, it is illogical to penalize a state agency, which enacts rules to ensure the uniform

19

application of prison management of inmates, by subjecting the agency to heightened judicial scrutiny triggered under the Due Process Clause. Rather, the more logical approach properly defers to the difficult and dangerous challenges faced by the Executive Branch in managing state prisoners, by providing that judicial review of challenges to Close Management is conducted not by writ of habeas corpus – which necessarily implies that a prisoner's right to immediate release is at stake and that heightened and less deferential review is required – but instead to conduct judicial review by the extraordinary writ of mandamus, in the same manner that challenges to disciplinary reports are filed in the Second Circuit Court in Leon County. See, e.g., Bush v. State, 945 So. 2d 1207, 1210 (Fla. 2006) (stating "if the prisoner alleges **entitlement to immediate release,** a petition for writ of habeas corpus is the proper remedy; whereas if the prisoner does **not** allege entitlement to immediate release, **a petition for writ of mandamus is the proper remedy.**") (footnote omitted; emphasis added); Magwood, 98 So. 3d at 725 (noting that challenge to disciplinary report was properly filed by writ of mandamus in Second Circuit in Leon County, but claim challenging placement in Close Management, which was based on same disciplinary report, was filed by writ of habeas corpus in county in which prisoner was incarcerated). Under our holding today, all claims in this case would be filed in the circuit court in and for Leon County, as would be more logical. This type of judicial review of Close

20

Management would be in the nature of an appeal of the Department's decision, in which a circuit court may not overturn a Department's administrative decision of assignment to Close Management, unless the Department's decision was clearly arbitrary. See, e.g., Sheley, 703 So. 2d 1202. As described in Sheley, further review of the Department's decision may be pursued by very limited "second-tier" certiorari in this court. Id. at 1206.

Habeas corpus is not the correct remedy to provide to a state prisoner who cannot make a claim for immediate release. Jones v. Sec'y, Dep't of Corr., 2015 WL 3952690 (N.D. Fla. June 28, 2015) (dismissing habeas corpus petition, in part, because no constitutional right to due process in disciplinary procedures employed by Department, and disciplinary confinement for 30 days did not deprive prisoner of "liberty," noting, "'Federal due process does not require that state prison officials strictly comply with administrative regulations governing disciplinary hearings in the prison setting'" (quoting Hilderbrandt v. Butts, 550 F. App'x 697, 700 (11th Cir. 2013)), and "'as various circuit courts [of appeal] have held when ruling on an inmate's claim that he was denied use of a prison's grievance procedure, an inmate has no constitutionally-protected liberty interest in access to that procedure.'" (quoting Bingham v. Thomas, 654 F.3d 1171, 1177 (11th Cir. 2011))); State ex. rel. Haley v. Groose, 873 S.W.2d 221 (Mo. 1994) (en banc). Here, Petitioner is not asserting an entitlement to immediate release from

21

incarceration, but only a release from Close Management. Courts have properly recognized, however, that such a change in incarceration status is only a change in the inmate's classification. Lowery v. Lambdin, 687 So. 2d 55, 57 (Fla. 4th DCA 1997) (noting that claim challenging Close Management classification was "not truly one for habeas corpus and therefore, [Article I, section 13, Fla. Const., providing for no cost to be charged to consider petition for habeas corpus] has no application. . . . On remand the trial court may consider whether the petition is properly brought as a habeas corpus.").

If it were not for our prior precedent under the liberty interest analysis and logic of Sandin, Petitioner would not be entitled to claim release by writ of habeas corpus, but instead would be required to file a petition for a writ of mandamus, as he can only state a claim in state law, to wit: the Department has somehow failed to follow its own self-binding procedures. Such a pleading would, by logic, be filed under mandamus in the Second Circuit Court in Leon County, the county in which the Department's headquarters are located. Burgess v. Crosby, 870 So. 2d 217, 219 n.5 (Fla. 1st DCA 2004) ("A petition for writ of habeas corpus . . . is properly filed in the county in which the inmate is being detained. If an inmate challenges a gain time issue, but is not claiming the right to immediate release, a petition for writ of mandamus is filed in the county where the Department of Corrections is headquartered." (citations omitted)). In other words, outside of the

22

status of Close Management issues, a prisoner asserting a claim other than entitlement to immediate release would not normally be permitted to state such a claim by petition for writ of habeas corpus in the county in which he is incarcerated, for the simple reason that the very nature of the writ is to "test solely the legality of the petitioner's imprisonment[.]" Sneed v. Mayo, 66 So. 2d 865, 869-70 (Fla. 1953) (holding "The great [writ] of habeas corpus is a writ of right obtainable under our Constitution by all [persons] who claim to be unlawfully imprisoned against their will. . . . The purpose of the writ being to bring the petitioner before a court of competent judicial tribunal in order that inquiry may be made into the legality of his detention . . . ." (citations omitted)); State ex. rel. Hamilton v. Mayo, 167 So. 34 (Fla. 1936) (holding "the rule being well settled that where an application for writ of habeas corpus is made to this court and the petition showing on its face that the alleged detention complained of is in conformity to a valid conviction and sentence, the writ itself may be denied on the face of the showing made . . ."). In Sneed, the petitioner asserted that he had not waived his right to a trial by jury, and the supreme court remanded the claim to the circuit court for an evidentiary hearing. 66 So. 2d at 874. In Hamilton, the petitioner claimed he had been convicted in a court which lacked "constitutional existence"; the supreme court denied the petition on its face. 167 So. at 35.

23

Thus, historically, a person seeking relief by writ of habeas corpus is – and by definition must be – asserting that he or she is entitled to immediate liberty and release from unlawful detention. In <u>Brown v. Wainwright</u>, 498 So. 2d 679, 679 (Fla. 1st DCA 1986), we held where a petition for writ of habeas corpus "fails to allege that the relief requested would entitle the petitioner to either an immediate release or a new trial, **the writ may not be granted**." (Emphasis added.) This is the correct rule of law and the traditional and historical basis for judicial relief by writ of habeas corpus. See also <u>Duncan v. Fla. Parole Comm'n</u>, 939 So. 2d 176, 176 (Fla. 1st DCA 2006) (holding that, although "inartfully pled," prisoner challenging revocation by Parole Commission of his prior conditional release stated claim for relief by writ of habeas corpus requiring circuit court to issue order to show cause); <u>Black v. State</u>, 490 So. 2d 1287, 1288 (Fla. 1st DCA 1986) (holding that "initial reason" for denying petition for writ of habeas corpus to appeal denial of writ of mandamus challenging Presumptive Parole Release Date "is that it does not allege that the relief requested will entitle the petitioner to release or a new trial"). But in the area of claims challenging the Department's decision to change a prisoner's status from general population to Close Management, we have departed from these legal principles, in part based on prior United States Supreme Court precedent now long rejected by that Court.

When the landmark decision of <u>Gideon v. Wainwright</u>, 372 U.S. 335 (1963), issued, the Florida Supreme Court devised a procedure to streamline claims involving alleged violations of the right to counsel under the Sixth Amendment to the United States Constitution.  As noted in <u>Baker v. State</u>, when the Florida Supreme Court enacted "Rule 1" (the predecessor to rule 3.850, Florida Rules of Criminal Procedure) to provide an avenue for prisoners to challenge their convictions under <u>Gideon</u>, the rule provided that where this new rule did not provide an adequate remedy, a prisoner could seek relief by petition for writ of habeas corpus "to test the legality of his **detention**."  878 So. 2d 1236, 1241 (Fla. 2004) (quoting <u>In re Criminal Procedure, Rule No. 1</u>, 151 So. 2d 634 (Fla. 1963)) (emphasis added).  Thus, while under certain limited circumstances a prisoner can assert a claim for habeas corpus to challenge a restraint on his or her liberty and proceed outside the normal collateral channel for relief, the rule does not authorize a challenge to the **conditions** of detention.  <u>See, e.g.</u>, <u>State v. Bolyea</u>, 520 So. 2d 562, 563 (Fla. 1988) (holding that postconviction rule is a "procedural vehicle for the collateral remedy otherwise available by writ of habeas corpus").  Here, for example, there is no claim that Petitioner is entitled to his "liberty," but only a claim that he should be allowed to be incarcerated in the general prison population rather than Close Management status.

The "Great Writ" of habeas corpus should be primarily reserved for judicial review of claims of unlawful detention, not claims challenging the type or the administration of detention, which sound primarily in terms of an administrative appeal. Sneed, 66 So. 2d at 869 (holding that habeas corpus "may not be used as a substitute for appeal"). Just as courts have declined to allow the writ to be used as a substitute for direct appeal in criminal cases, it is not proper, in our view, to allow the writ to be used as a substitute for an administrative appeal challenging an agency's execution of its administrative duties.

Florida's organic law mandates that the judiciary accord the most prompt consideration to a person seeking release by writ of habeas corpus, precisely because the time-honored and historical basis for the writ is to allow a person prompt consideration of a claim that they are being held without lawful authority: "The writ of habeas corpus shall be grantable of right, freely and without cost. It shall be returnable **without delay**[.]" Art. I, § 13, Fla. Const. (emphasis added). District courts have enforced this constitutional mandate unequivocally. Bocharski v. Circuit Court of Second Judicial Circuit In and For Leon County, 552 So. 2d 946 (Fla. 1st DCA 1989); Bradley v. Sturgis, 541 So. 2d 766 (Fla. 5th DCA 1989). But where the claim is **not** based on the assertion that a person is detained without lawful authority, but solely on the claim that administration of the detention is not in accord with the agency's own rules, then other considerations of judicial

26

administration and proper deference to other branches of government under Article II, section 3 of the Florida Constitution must be given due respect. See generally Detournay v. City of Coral Gables, 127 So. 3d 869, 873 (Fla. 3d DCA 2013) (describing doctrine of sovereign immunity as founded on principle of separation of powers, "one of the structural pillars upon which American freedoms rest: 'under the constitutional doctrine of separation of powers, the judicial branch must not interfere with the discretionary functions of the legislative or executive branches of government absent a violation of constitutional or statutory rights.' To hold otherwise . . . 'would require the judicial branch to **second guess the . . . police power decisions of the other branches of government** and would violate the separation of powers doctrine.'" (citing Trianon Park Condo. Ass'n, Inc. v. City of Hialeah, 468 So. 2d 912, 918 (Fla. 1985) (emphasis added))). Here, as we now recognize, there is no federal or state constitutional right of a state prisoner to remain in the prison's general population. Therefore, the only question posed by a challenge to a Department decision assigning a state prisoner to Close Management is whether the Department acted with "no" evidence to support its decision or possibly acted in a completely arbitrary fashion, in which case, relief may be granted by extraordinary writ of mandamus, not by writ of habeas corpus, as no constitutional right to release or a new trial is at issue.

Close Management prison classifications do not create conditions that are "atypical" of general population status, to the extent that a liberty interest would be created under the Due Process Clause. See generally Al-Amin v. Donald, 165 F. App'x 733, 737-38 (11th Cir. 2006) (holding that state prisoner challenging confinement in administrative segregation for approximately three years did not establish liberty interest "under the particular facts of this case," therefore, it is "unnecessary for us to determine whether . . . procedures for confining Al-Amin to administrative segregation **and for keeping confined there** provided Al-Amin with due process") (emphasis added). In Al-Amin, the court noted that confinement "to administrative segregation, under conditions substantially similar to those experienced by the general population of the prison, does not implicate liberty interests," despite the lengthy time Al-Amin had been so confined. Id. at 738. But the Court cautioned that state officials must periodically review such status, which by their own rules are required in Florida by the Department. Cf. Wilkinson v. Austin, 545 U.S. 209, 213 (2005) (holding that transfer to "supermax" facility in which "almost all human contact" was prohibited and confinement was indefinite implicated a liberty interest). Significantly, here there is no Eighth Amendment claim that assignment to Close Management as a matter of law constitutes cruel and unusual punishment. Osterback v. McDonough, 549 F. Supp. 2d 1337, 1356-63 (M.D. Fla. 2008) (holding no Eighth Amendment

28

violation in Department's Close Management regulations, stating "Inmates in [Close Management] have the same cell furnishings as inmates in the general population . . . .[and] receive the same clothing and bedding that general population inmates receive. The barber and grooming services for [such] inmates and open population inmates are also the same [as are] the same three meals each day that open population inmates receive. . . . [they] are provided with adequate opportunities to exercise. . . . [Close Management] inmates have adequate access to educational opportunities, and have adequate opportunities to make canteen purchases and engage in visitation."); Groose, 873 S.W. 2d at 223 (holding that where claim fails to allege cruel and unusual punishment, "habeas corpus is not available to attack the conditions of his confinement"). There is simply no credible argument, based on the regulations establishing Close Management parameters, that these restrictions on their face are "atypical" of the general population.

As such, individualized claims that the Department has failed to follow its own rules in assigning a prisoner to Close Management are not valid assertions of constitutional claims but, rather, allegations of such state law violations that do not implicate a constitutionally-protected liberty interest. But if an inmate alleges that a condition of Close Management is cruel and unusual punishment, thus violating the Eighth Amendment, such a claim could be cognizable by petition for writ of habeas corpus. Absent such an allegation, however, we hold that an inmate's

29

challenge to assignment to Close Management may only be asserted by filing a petition for writ of mandamus in Leon County, the Department's headquarters. As we wrote in Plymel, the prisoner's burden of persuasion in seeking mandamus relief to challenge an assignment to Close Management will be to show that "he has a clear legal right to the performance of a clear legal duty by a public officer, and that he has no other available legal remedies." 770 So. 2d at 246. Further, the inmate must show that he has exhausted all available administrative remedies. Id. Once the petition for writ of mandamus establishes a *prima facie* entitlement to relief, the circuit court should issue an order to show cause why such relief should not be granted. Holcomb, 609 So. 2d at 751. As noted above, review in this court of a circuit court's decision will be by "second-tier" certiorari. Plymel, 770 So. 2d at 246 (noting that "a circuit court order ruling on an administrative action is reviewable in the district court by certiorari"). As we held in Plymel, the standard of review of a circuit court order is "limited to whether the circuit court afforded procedural due process and whether the circuit court applied the correct law." 770 So. 2d at 246. See also Woullard v. Bishop, 734 So. 2d 1151 (Fla. 1st DCA 1999). Thus, for example, if a prisoner alleges he has been deprived of the periodic review required by the rules described above, he may be entitled to mandamus relief; merely disagreeing with the Department's discretionary decisions cannot show entitlement to relief, as there would be no showing of a "clear legal right."

We respectfully disagree with the concern expressed in Judge Wolf's concurring and dissenting opinion that our opinion today must always lead an inmate to a "dead end" where no relief can be granted. As noted above, should the inmate state a *prima facie* case that the Department failed to comply with its own rules – for example, by refusing to ensure the inmate's status continues to meet the Department's criteria under its own rules – a circuit court could be required to issue a show cause order to the Department, necessitating further evaluation in that court. See, e.g, Moore v. Fla. Parole & Prob. Comm'n, 289 So. 2d 719, 720 (Fla. 1974) (holding mandamus will not lie to compel grant of parole, which is solely within the discretion of the Parole and Probation Commission, but "[t]he Parole Commission is required, as any other body, to comply with constitutional requirements; it cannot deny parole upon illegal grounds or upon improper considerations. It is **answerable in mandamus if it does.**") (emphasis added)), *cert. den.*, 417 U.S. 935 (1974). Relevant here, in Moore, the Florida Supreme Court held that habeas corpus was not available to an inmate to challenge a **Presumptive** Parole Release Date, which does not entitle an inmate to a reasonable expectation of imminent release from prison. In contrast, an inmate's claim that an **Effective** Parole Release Date has been improperly set, which can more likely affect an inmate's opportunity for release from prison, can be asserted by petition for writ of habeas corpus. See Fla. Parole & Prob. Comm'n v. Dornau, 534 So. 2d

31

789, 792 (Fla. 1st DCA 1988) (citing <u>Griffith v. Fla. Parole & Prob. Comm'n</u>, 485 So. 2d 818 (Fla. 1986), and noting that "judicial review is available only through the common law writs of mandamus, for review of [Presumptive Parole Release Dates], and habeas corpus, for review of [Effective Parole Release Dates]."); <u>see generally</u> <u>Sheley v. Fla. Parole Comm'n</u>, 703 So. 2d 1202, 1205 (Fla. 1st DCA 1997) (citing <u>Griffith</u> and recognizing that the Florida Supreme Court established that "review of Parole Commission orders was . . . available by mandamus or habeas corpus," and establishing second-tier certiorari review of denial of mandamus relief against Parole Commission); <u>see also</u> <u>Richardson v. Fla. Parole Comm'n</u>, 924 So. 2d 908 (Fla. 1st DCA 2006) (holding that inmate stated claim in habeas corpus challenging Florida Parole Commission's order revoking conditional release supervision and remanding him to state prison). Thus, similar to the parole (and conditional release) context, here, where the Department assigns an inmate to Close Management, should the inmate challenge this decision by petition for writ of mandamus, the circuit court will determine whether a prima facie case has been established that the Department relied on improper considerations or failed to follow its own rules. Such a proceeding lies appropriately in mandamus, filed and considered in the Second Circuit Court in Leon County, where the Department's headquarters are located, not by petition for writ of habeas corpus.

32

### 3. *Stare Decisis*

By our decision today, we recede from prior case law that improperly subjected prison management decisions to extraordinary judicial review by habeas corpus based on flawed analyses long rejected by the United States Supreme Court, as thoroughly discussed above. As the United States Supreme Court has recognized, although *stare decisis* is the "preferred course" in the judicial process, "when governing decisions are unworkable or are badly reasoned, 'this Court has never felt constrained to follow precedent.'" Payne v. Tennessee, 501 U.S. 808, 827 (1991) (overruling prior decisions prohibiting admission of victim impact statements in capital murder prosecutions where the death penalty may be imposed) (quoting Smith v. Allwright, 321 U.S. 649, 655 (1944)). As the Court also recognized in Payne, considerations of *stare decisis* are particularly weak in cases in which legislative correction is either impossible or difficult to achieve. Id. Rather, deference to *stare decisis* is most important in cases "involving property and contract rights, where reliance interests are involved." Id. at 828. Here, all these considerations support our decision to recede from contrary prior case law. The prior decisions were based on flawed logic, the decisions cannot be easily abrogated by the legislature, as they implicated constitutional interests, and the prior decisions do not affect property or contract rights. By contrast, the prior decisions erroneously thrust this court into improper judicial second-guessing of

33

the Executive Branch's daunting and dangerous duty to manage state prisons and strive to protect staff and inmates, as well as public visitors. By providing that Close Management prison classifications are reviewable only by writ of mandamus filed in the Second Circuit Court in Leon County, we will enhance stability and uniformity in circuit court review and better accord due deference to the Executive Branch.

**4. Petitioner's Claim**

Here, Petitioner did not assert that Department officials failed to adhere to periodic review or any other minimum procedures established by their own rules. Thus, whether the Department correctly determined that Petitioner's act of spitting in the face of an examining psychiatrist was an act "likely to cause injury" is a discretionary decision, and may not be the basis for mandamus relief. Smith v. State, 696 So. 2d 814, 815 (Fla. 2d DCA 1997) (recognizing that mandamus "is a common law remedy to be used to enforce an 'established legal right by compelling a person in an official capacity to perform an indisputable ministerial duty required by law.'" (citation omitted)). In Cason v. McDonough, 943 So. 2d 861, 862-63 (Fla. 1st DCA 2006), this court noted that the Florida Supreme Court in Dugger v. Grant, 610 So. 2d 428, 432 (Fla. 1992), stated that a "modicum" of evidence is sufficient to satisfy the "some evidence" standard required to sustain a prison disciplinary report under Superintendent, Massachusetts Correctional

Institution v. Hill, 472 U.S. 445, 455-56 (1985). In other words, as long as there is "some evidence" that Petitioner committed the act alleged, which he did not deny below, then mandamus relief must be denied.

Here, Petitioner failed to deny that he spat in the staff psychologist's face but, rather, made only conclusory allegations that such an act could not "injure" another. As this is not a criminal proceeding, it was not necessary for the Department to find Petitioner guilty beyond a reasonable doubt, so cases discussing the State's burden of persuasion in criminal prosecutions are inapposite. Smiley v. State, 948 So. 2d 964, 964 (Fla. 5th DCA 2007) (holding that "'[r]evocation of good time credits [in prison disciplinary context] is not comparable to a criminal conviction, and neither the amount of evidence necessary to support such conviction, nor any other standard greater than *some evidence* applies in this context.'" (quoting Dugger v. Grant, 610 So. 2d 428, 432 n.3 (Fla. 1993) (emphasis in original))). Cf. Bujno v. Dep't of Corr., 1 So. 3d 1138 (Fla. 1st DCA 2009) (holding that because circuit court did not require Department to directly respond to merits of prisoner's defense, evidence was insufficient to affirm circuit court's ruling of guilty of possession of contraband by constructive possession). Here, Petitioner failed to show a *prima facie* entitlement to extraordinary relief, because he failed to deny that he did not spit in the psychologist's face. See Holcomb, 609 So. 2d at 751. Here, the petition itself

35

failed to sufficiently allege that the Department unlawfully classified Petitioner to Close Management status, by neither denying that he committed the acts involved or asserting a credible argument that such acts were not an adequate basis for the reclassification.

Therefore, we can affirm the denial of relief here, even though the circuit court did not, and could not, consider the claim in mandamus. See John v. Crews, 149 So. 3d 149 (Fla. 1st DCA 2014) (holding that although circuit court applied incorrect law regarding prisoner's cause of action and entitlement to avoid filing fee, decision would be affirmed, as prisoner serving life sentence had no entitlement to gaintime award, and no liberty interest was implicated). Therefore, we affirm the circuit court's denial of relief without further proceedings.

### Conclusion and Conflict Certified

We acknowledge that in Holland, the Fifth District affirmed a circuit court order denying the writ of habeas corpus without discussing whether that was the proper remedy after the United States Supreme Court decided Sandin, but which cited our decisions in Taylor v. Perrin, 654 So. 2d 1019 (Fla. 1st DCA 1995), and Granger. Holland, 791 So. 2d at 1257. Because we recede from our prior decisions in this court allowing such claims to be considered in habeas corpus, we certify conflict with Holland. We also acknowledge that in Harvard v. Singletary, 733 So. 2d 1020, 1024 (Fla. 1999), the Florida Supreme Court transferred a

36

petition challenging a Close Management assignment to the county in which the prisoner was incarcerated. But that decision discussed the supreme court's rationale for transferring petitions for extraordinary relief requiring factual findings, and the court specifically stated that it was not making a decision "that the petition has been properly titled a petition for writ of habeas corpus." In addition, the supreme court acknowledged that a filing fee could be required. Thus, we do not read Harvard as a decision on the merits determining that claims challenging assignments to Close Management must be considered by petition for writ of habeas corpus.

We also acknowledge that, by our decision today, prisoners challenging such decisions by petition for writ of mandamus will be required to pay a filing fee pursuant to sections 57.081 and 57.082, Florida Statutes, absent a decision that they are indigent. See John v. Crews, 149 So. 3d 149 (Fla. 1st DCA 2014) (discussing appropriate statute applicable to claims challenging disciplinary confinement, but affirming dismissal for failure to qualify for fee exemption on other grounds). In some cases, this may impose a hardship on non-indigent prisoners attempting to challenge assignment to Close Management, but that implication is a policy matter addressed to the legislative branch, as our decision that such claims do not lie in habeas corpus precludes this court from engaging in that determination.

37

The amended petition for writ of certiorari is DENIED on the merits, for reasons stated above, and conflict to <u>Holland v. State</u>, 791 So. 2d 1256 (Fla. 5th DCA 2001), is certified.

DENIED ON THE MERITS; CONFLICT CERTIFIED.

ROBERTS, C.J., and LEWIS, WETHERELL, ROWE, RAY, OSTERHAUS, KELSEY, and WINOKUR, JJ., concur.

WOLF, J., concurs in part and dissents in part in an opinion in which MAKAR, BILBREY, JAY, and M.K. THOMAS, JJ., join.

MAKAR, J., dissents in an opinion in which BILBREY, J., joins.

WINSOR, J., recused.

WOLF, J., concurring and dissenting with opinion.

I concur in that portion of the majority opinion that determines that this particular inmate is not entitled to relief. I also concur in the decision to declare conflict with the Fifth District Court of Appeal's decision in Holland v. State, 791 So. 2d 1256 (Fla. 5th DCA 2001). I would additionally certify a question of great public importance concerning the appropriate method and scope of judicial review of decisions to segregate prisoners from the general population. I respectfully dissent from the decision to overturn almost 35 years of precedent which allowed inmates to file habeas corpus proceedings in the state circuit courts to challenge their assignments to close management.

The majority opinion states that we should adopt the reasoning of Sandin v. Conner, 515 U.S. 472 (1995), and holds that an inmate has no liberty interest concerning the Florida Department of Corrections' (Department) decision to place him or her in close management. The majority therefore determines that habeas corpus review is no longer available.

Under our existing precedent, this holding denies the prisoner any meaningful judicial review of the decision to be placed in close management, no matter the duration. As explained later in this opinion, the decision by federal courts and the federal government, which have no custodial responsibility for these inmates, to limit their oversight of prison management should not affect the review

39

process at the state level. If anything, the limited oversight adopted by the federal courts makes it more essential to maintain reasonable review of decisions made by the party having primary custodial responsibility of our prisoners, the Department. Inmates segregated from the general prison population for a potentially significant period of time should continue to have the same reasonable court oversight concerning their segregation from the general prison population that they have had since 1982. Insignificant justification has been provided to overturn our precedent and to effectively extinguish this important safeguard.

## Facts

The majority has accurately described the procedural posture and underlying facts in support of petitioner's placement in close management status. Thus, there is no need to repeat the work of the majority.

For purposes of this opinion, however, it is necessary to clarify petitioner's status and the implications concerning his placement.

Close management is "confinement of an inmate apart from the general population." Fla. Admin. Code R. 33-601.800(1)(d). The Department placed petitioner in the Close Management I (CMI) category, the most restrictive single-cell housing level of the close management classifications. Fla. Admin. Code R. 33-601-800(1)(e). The record does not show how long petitioner will be held in close management, presumably until the Department feels such segregation from

40

the general population is no longer necessary. <u>See</u> Fla. Admin. Code R. 33-601.800(16)(a). While risk assessments are done periodically, formal review only takes place after 180 days (six months) of placement in close management and every 180 days thereafter. Fla. Admin. Code R. 33-6601.800(16)(e). There is no guarantee that an inmate will be released at the time of any formal review; therefore, the duration of the segregation is indefinite and may be for extended periods of time.

While a review of Florida Administrative Code Rule 33-601.800 demonstrates that close management is not the solitary confinement as depicted in movies like "Murder in the First" (Warner Bros. 1995) or "The Shawshank Redemption" (Castle Rock Entertainment 1994), it still involves segregation from the general population and significant restrictions on items associated with human dignity which may have serious implications regarding a prisoner's wellbeing.[2]

---

[2] 1). Close management status affects an inmate's ability to work, which affects an inmate's ability to earn gain time. Close management inmates do not get credit or gain time for participating in the GED/education class because their work is all in-cell, which means their participation time is not counted. For inmates in the general population, gain time for education/vocation is based upon an inmate's presence in the classroom and his or her participation. Inmates in the general population are automatically assigned to a job or program.

2). Close management inmates are only guaranteed a shower three times per week (<u>see</u> Fla. Admin. Code R. 33-601.800(10)(e)), whereas inmates in the general population can shower seven days per week.

See Grant Henderson, Disciplinary Segregation; How the Punitive Solitary Confinement Policy in Federal Prisons Violates the Due Process Clause of the Fifth Amendment in Spite of Sandin v. Conner, 99 Marq. L. Rev. 477 (Winter 2015). It is particularly significant that inmates who are placed in close management are subject to having any of their privileges suspended or revoked with very limited review. See Fla. Admin. Code R. 33-601.800(12).

---

3). Close management inmates' visits are restricted as follows: CMI – one non-contact visit for two hours, once a month; CMII – one non-contact visit for two hours every two weeks; and CMIII – one contact visit every two weeks. All visits must be scheduled by appointment. See Fla. Admin. Code R. 33-601.800(11)(b)6, (11)(c)1, & (11)(d)1. By comparison, inmates in the general population are allowed weekly contact visits (Saturday/Sunday) for six hours (plus the holidays).

4). CMI inmates are only allowed to make one fifteen-minute call per month; CMII inmates are only allowed to make one fifteen-minute call every two weeks; and CMIII inmates are only allowed to make one fifteen-minute call every week. See Fla. Admin. Code R. 33-601.800(11)(b)5, (11)(c)2, and (11)(d)3. In the general population, during weekdays phones are turned on at 12:00 p.m. and remain on until 11:00 p.m., and on weekends and holidays, phones are turned on at 8:00 a.m. and remain on until 11:00 p.m., and inmates may make as many calls as they like.

5). CMI inmates are handcuffed and shackled upon exiting their cells at all times, whether it is for group activities, medical or dental appointments or counseling. See Fla. Admin. Code R. 33-601.800(14)(a).

6). Inmates who are placed in close management are also subject to having any of these privileges suspended or revoked with very limited review. Fla. Admin. Code R. 33-601.800(12).

Indeed, the courts of this state have consistently held that these substantial and significant deprivations for potentially lengthy periods of time are subject to habeas corpus review.

Current Status of the Law

For almost 35 years, this court has held that an inmate is entitled to challenge the assignment to close management status by filing a petition for writ of habeas corpus in circuit court. Costello v. Strickland, 418 So. 2d 443 (Fla. 1st DCA 1982).

In Kendrick v. McNeil, 6 So. 3d 657 (Fla. 1st DCA 2009), we recognized the consistent availability of this remedy. The Kendrick opinion noted:

> This Court has consistently held that an inmate who seeks release from close management back into the general prison population is entitled to proceed through a petition for writ of habeas corpus. *See Ashley v. Moore*, 732 So. 2d 498 (Fla. 1st DCA 1999); *Norris v. Dep't of Corrections*, 721 So. 2d 1235 (Fla. 1st DCA 1998); *Taylor v. Perrin*, 654 So. 2d 1019 (Fla. 1st DCA 1995); *Guess v. Barton*, 599 So. 2d 770 (Fla. 1st DCA 1992); *Roy v. Dugger*, 592 So. 2d 1235 (Fla. 1st DCA 1992); *Thompson v. Dugger*, 509 So. 2d 391 (Fla. 1st DCA 1987); *see also Holland v. State*, 791 So. 2d 1256 (Fla. 5th DCA 2001).

Id. at 658. [3]

Since Kendrick, we have continued to recognize our consistent holding that an inmate challenging close management status may do so through habeas corpus.

---

[3] See also Magwood v. Tucker, 98 So. 3d 725 (Fla. 1st DCA 2012); Granger v. Fla. State Prison, 424 So. 2d 937 (Fla. 1st DCA 1983).

<u>Magwood v. Tucker</u>, 98 So. 3d 725 (Fla. 1st DCA 2012). The right to challenge "arbitrary transfers" from the general prison population to administrative segregation is based not only on federal due process concerns, but also rights recognized by the State of Florida. <u>Granger v. Fla. State Prison</u>, 424 So. 2d 937 (Fla. 1st DCA 1983). The majority and the Department urge this court to recede from our precedent because of the holding in <u>Sandin v. Conner</u>, 515 U.S. 472 (1995).

<u>Sandin v. Conner, 515 U.S. 472 (1995)</u>

We should not recede from our well-reasoned precedent in light of <u>Sandin</u> because: 1) the holding in <u>Sandin</u> merely limits the right of federal courts to interfere with supervisory decisions made by state prison officials; 2) the holding in <u>Sandin</u> does not mandate that states no longer recognize a limited liberty interest in remaining in the general prison population; 3) this court has recognized a state liberty interest in remaining in the general prison population a number of times since <u>Sandin</u> was decided 21 years ago; 4) the State has not presented sufficient justification to depart from almost 35 years of precedent; 5) <u>Sandin</u> addressed segregation from the general prison population for a limited period of time – here we have confinement for an unlimited duration; 6) if both federal and state oversight are extinguished, a prisoner faced with arbitrary confinement will be left

44

with no adequate remedy; and 7) the obligation of the State to treat prisoners held in its custody fairly and humanely implores us not to do so.

Sandin involved review of a federal lawsuit filed by a Hawaiian prisoner pursuant to 42 U.S.C. § 1983 to challenge his assignment to close management for 30 days. Id. at 476. He asserted that the State of Hawaii had denied him due process guaranteed by Wolff v. McDonnell, 418 U.S. 539 (1974). Id. He sought injunctive relief, declaratory relief and damages among other items.[4] Id. The holding in Sandin was that 30 days of administrative segregation did not involve such an atypical and significant deprivation to create a federal liberty interest to justify federal intervention into the oversight of inmates by the state. It further stated that state rules providing inmates protection from abuses would not create such a right. Id. at 487.

Sandin did not mandate that the state limit its own oversight of officials that place prisoners in administrative segregation, nor did it mandate that the state, the entity responsible for the health, safety, and humane treatment of human beings held in its custody, no longer provide meaningful judicial review. Sandin did not hold that the state may not recognize a limited liberty interest in close management decisions. Indeed, both the Florida Supreme Court and the United States Supreme

---

[4] The issue before us, unlike Sandin v. Conner, 515 U.S. 472 (1995), simply involves court oversight of the decision to segregate a prisoner, not a prisoner's right to seek damages.

45

Court have recognized that "'state courts are absolutely free to interpret state constitutional provisions to accord *greater protection* to individual rights than do similar provisions of the United States Constitution.'" Rigterink v. State, 66 So. 3d 866, 888 (Fla. 2011) (quoting Arizona v. Evans, 514 U.S. 1, 8 (1995)). See also State v. Horwitz, 41 Fla. L. Weekly S211, S215 (Fla. May 6, 2016) ("[T]he United States Constitution generally sets the 'floor' – not the 'ceiling' – of personal rights and freedoms that must be afforded to a defendant by Florida law."). Once the federal system effectively withdrew from any oversight of prison officials responsible for the classification and living conditions of inmates, it became even more essential for the state court system to maintain meaningful review.

Indeed, even the federal courts might not refrain from oversight of potentially indefinite durations of administrative segregation. See Wilkinson v. Austin, 545 U.S. 209 (2005). In Wilkinson, the United States Supreme Court held that there were limited federal due process rights for inmates placed in "supermax" facilities where placement was for an indefinite period. While the conditions faced by the prisoners in Wilkinson were far more onerous than the ones outlined in our rules regarding close management, the court was also concerned with the indefinite period of segregation that was limited only by the length of an inmate's sentence.[5] Ohio, like Florida, had limited formal review of the duration of the segregation.

---

[5] This case does not involve an assignment to the maximum management

46

The federal courts, which do not have primary responsibility for an inmate's safety and wellbeing, have stated that they will not get involved unless an inmate's deprivation is atypical and substantial. See Sandin, 515 U.S. 472. State courts with primary oversight responsibilities should not draw the same line.[6] As noted by the majority, the Eleventh Circuit has held that 3 years in close management was not an atypical and significant hardship. See Al-Amin v. Donald, 165 F. App'x 733, 734 (11th Cir. 2006). A standard that does not provide meaningful review for this length of segregation is unworkable at the state level.

In fact, to this point, we have chosen not to draw the same line. In at least four cases since Sandin, this court has stated that a petition for writ of habeas corpus is still the appropriate method for challenging close management classification. See Magwood, 98 So. 3d 725; Kendrick, 6 So. 3d 657; Ashley, 732 So. 2d 498; Norris, 721 So. 2d 1235.[7]

_____

classification pursuant to Florida Administrative Code Rule 33-601.820. Maximum management may be more like the conditions outlined in Wilkinson v. Austin, 545 U.S. 209 (2005).

[6] In Toward a Standard of Meaningful Review: Examining The Actual Protections Afforded To Prisoners In Long Term Solitary Confinement, 163 U. Pa. Law Rev. 1159 (Mar. 2015), the author Elli Marcus does a good job demonstrating how the Sandin standard is totally inadequate in affording reasonable protections for inmates facing administrative segregation of indefinite duration.

[7] The Fifth District held that a petition for writ of habeas corpus was properly denied where a prisoner sought release from close management. Holland v. State, 791 So. 2d 1256 (Fla. 5th DCA 2001). The Fourth District sent a case back to trial court to determine whether habeas or mandamus was available to challenge close management. Lowery v. Lambdin, 687 So. 2d 55 (Fla. 4th DCA 1997).

## Effect of Majority's Holding

The majority holds that the decisions regarding a prisoner's placement in close management and segregation from the general prison population do not implicate a constitutionally-protected liberty interest. Therefore, the majority holds that habeas corpus review is no longer available and that any request for relief must be by petition for writ of mandamus filed in the Second Circuit for Leon County.

The effect of the majority's holding is to deny any review of any assignment to close management for any duration because this court has long held that a prisoner must have a liberty interest in order to bring a petition for writ of mandamus challenging the Department's actions.

In Plymel v. Moore, 770 So. 2d 242, 249 (Fla. 1st DCA 2000), this court held that a prisoner was entitled to mandamus relief to require the Department to follow its own rules and provide limited due process predicated on the substantive liberty interest implicated by the prisoner's loss of gain time. In a number of recent cases, we have held that absent a showing of such a liberty interest, a prisoner lacks even minimal due process rights, and thus is not entitled to mandamus relief. See Williams v. Tucker, 87 So. 3d 1270, 1271 (Fla. 1st DCA 2012) (affirming the denial of a petition for writ of mandamus because the prisoner, who was subjected to 60 days' disciplinary confinement, "failed to

demonstrate any liberty interest implicating the protections of the Due Process Clause"); see also Gardener v. Fla. Dep't of Corr., 178 So. 3d 92, 94 (Fla. 1st DCA 2015) (finding the circuit court applied the correct law in denying a prisoner's petition for writ of mandamus in reliance on Sandin, concluding "no liberty interest was involved" in prison disciplinary action that resulted in disciplinary confinement); Castillo v. State, Dep't of Corr., 174 So. 3d 452, 453 (Fla. 1st DCA 2015) (finding a circuit court did not depart from the essential requirements of the law in denying as "frivolous" a mandamus petition challenging a prison disciplinary proceeding that resulted in 30-days' disciplinary confinement because the prisoner "failed to demonstrate any liberty interest implicating the protections of the Due Process Clause"); John v. Crews, 149 So. 3d 149, 151 (Fla. 1st DCA 2014) (affirming the dismissal of a petition for writ of mandamus because "the revocation of gain-time does not implicate appellant's liberty interests in this case because appellant is serving a life sentence" and thus is "ineligible for gain-time"); Wright v. McDonough, 958 So. 2d 1132, 1133 (Fla. 1st DCA 2007) (finding the circuit court properly denied a petition for writ of mandamus challenging a disciplinary proceeding which "adversely affected Petitioner's ability to earn gain-time," citing Wolff and Sandin).

Thus, the type of review available under existing law would cease to exist. Issues such as arbitrariness (which this court said was reviewable in Granger, 424

So. 2d 937), lack of proper notice (which this court found to be reviewable in Thompson, 509 So. 2d 391), and even failures of the Department to follow its own rules (see Plymel, 770 So. 2d 242) would not be reviewable by the court without demonstrating a liberty interest, which the majority finds is not implicated by close management. The majority's suggestion that review is available by mandamus is merely a dead end due to the majority's holding that there is no liberty interest. The majority's suggestion that it is not creating a dead end is simply not supported by our recent case law that requires a liberty interest in order for a prisoner to obtain mandamus relief. It also creates confusion regarding the scope of mandamus review.

Insufficient Justification for Overturning Precedent

Absent a significant change in circumstances or a substantial policy reason, a court should adhere to its precedent pursuant to the doctrine of stare decisis. Kimble v. Marvel Entm't, LLC, 135 S. Ct. 2401, 2409 (2015).

> Overruling precedent is never a small matter. *Stare decisis* – in English, the idea that today's Court should stand by yesterday's decisions – is "a foundation stone of the rule of law." Application of that doctrine, although "not an inexorable command," is the "preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process."

Id. at 2409 (citations omitted).

In refusing to overturn precedent, the United States Supreme Court went on to say that adhering to stare decisis means an allegation by itself that prior decisions are wrong provides an insufficient reason to overturn precedent.

> Accordingly, an argument that we got something wrong – even a good argument to that effect – cannot by itself justify scrapping settled precedent. Or otherwise said, it is not alone sufficient that we would decide a case differently now than we did then. <u>To reverse course, we require as well what we have termed a "special justification" – over and above the belief "that the precedent was wrongly decided."</u>

<u>Id.</u> (emphasis added; citations omitted).

This court acknowledged the vital importance of precedent and stare decisis in <u>Westphal v. City of St. Petersburg</u>, 122 So. 3d 440, 447 (Fla. 1st DCA 2013), <u>quashed on other grounds by</u> <u>Westphal v. City of St. Petersburg</u>, 41 Fla. L. Weekly S261 (Fla. June 9, 2016). We noted with approval the United States Supreme Court case of <u>Arizona v. Rumsey</u>, 467 U.S. 203 (1984), which stated the rule of law "that a Court should not depart from precedent in the absence of a special justification." <u>Westphal</u>, 122 So. 3d at 447. While the court in <u>Westphal</u> departed from precedent, it did so based on two justifications not present in the existing case: 1) that the legal argument (unconstitutional application of the statute) had not been made in the previous cases; and 2) the prior court interpretation had spawned unexpected and unjust results. Neither is present or argued in this case. The precise argument made by the Department in this case was previously rejected in <u>Kendrick</u> and <u>Magwood</u>. Further, there is no evidence that any unexpected results

51

have occurred as a result of this court's precedent. A review of the case law demonstrates a system that is operating well with reasonable limited review of decisions to segregate prisoners.

The Department's main arguments for overturning precedent are that 1) by not confining challenges to the Leon County Circuit Court, it <u>may</u> receive inconsistent decisions affecting its ability to supervise prisoners; and 2) the habeas standard of review may lead to the courts micromanaging the prison system. Mere speculation concerning possible inconvenience is insufficient to justify abandoning precedent. In fact, a review of prior case law demonstrates the Department's fears are unrealistic.

The Department has not cited one instance in 35 years in which there has been an inconsistent circuit or appellate decision which has affected its ability to manage the prison population. Our court system is designed to resolve such conflicts should they arise. Nor is there any evidence that trial judges in circuits other than the Second Circuit would not render well-thought-out decisions concerning whether the Department is following its rules or providing minimal due process in imposing administrative segregation. Departmental convenience concerning Leon County venue privileges is not a valid reason for limiting this important right of inmates.

The majority asserts that the courts should not be involved in micromanaging the Department in its difficult job of maintaining control within the prison system, and therefore, we should recede from our prior case law. No one disputes it is a difficult job to manage inmates, but the Department has failed to demonstrate that in almost 35 years of limited court oversight, the courts have interfered with the operation of the prison system. No specific instance concerning micromanagement is cited. Few, if any, decisions have resulted in the Department's decisions being overturned. Review even by habeas corpus is limited in nature. The present habeas corpus review is limited and does not allow an inmate to bring an action in circuit court until all administrative remedies have been exhausted. See Sutton v. Strickland, 485 So. 2d 25 (Fla. 1st DCA 1986). The Department has a full opportunity during the administrative process to demonstrate it has met the limited due process rights afforded an inmate concerning classification decisions. See, e.g., Plymel, 770 So. 2d at 249. Decisions of the Department have not been second-guessed, but court oversight has served to protect from totally arbitrary actions of the Department or substantial failure of the Department to follow its own rules. Id.

In those rare occurrences where the Department has been required to respond, it has primarily been for the Department to present record evidence that it has followed its own rules. See, e.g., Thompson, 509 So. 2d 391. Again, the

convenience of the Department to have cases filed in Leon County does not justify overturning our precedent.

Reasonable oversight does not violate separation of powers principles. In fact, it is the duty of the court to provide limited oversight to prevent arbitrary abuses. It cannot be reasonably argued that such abuses may not occur. The courts need to be available, even if on a limited basis, to prevent such behavior. Because the Department has failed to demonstrate that "special justification" for overturning our well-reasoned precedent, I would not do so.

MAKAR, J., dissenting.

Thirty-five years of precedent are jettisoned, replaced in part by a pastiche of legal concepts cobbled together to create a newfound remedy, proving the adage that a camel is a horse designed by committee. Neither constitutional text, precedent, nor changed circumstances support the result; conflict and confusion are created where none has existed; and unforeseen, hydra-like consequences are born. Little commends the end product; it's a solution for a non-existent problem.

Let's put this en banc case—purportedly of exceptional importance—in context. It is one of a miniscule subcategory of inmate petitions comprising about 0.2% of our annual workload of approximately 5000 cases. About ten times a year, an inmate put in close management (CM) seeks judicial review, claiming his placement is so arbitrary or oppressive as to invoke judicial intervention. Relief is usually denied, sometimes summarily, but not always. The judicial burden of processing these few cases pales in comparison to the avalanche of prisoner petitions processed in this Court[8] and others[9] for which relief is most often denied. See Harvard v. Singletary, 733 So. 2d 1020, 1023 (Fla. 1999) ("Many prisoner

---

[8] In 2015, 1079 original criminal petitions were filed in this Court, the bulk of which involve inmates seeking extraordinary writs. This number has been approximately 1000 petitions annually since 2011.

[9] In 2015, 691 original criminal petitions were filed in the Florida Supreme Court seeking extraordinary writs. This exceeds the 500 mentioned in its decision in Harvard v. Singletary, 733 So. 2d 1020 (Fla. 1999).

petitions are successive, and a large number are completely without merit."). From a judicial administration perspective, we face greater challenges than the processing of this lilliputian sliver of our docket.

For over three decades, our precedent has authorized this process, one that has proven neither unworkable nor controversial. See, e.g., Costello v. Strickland, 418 So. 2d 443 (Fla. 1st DCA 1982) (granting relief in prisoner's challenge to CM status raised in a habeas petition). Now, the Department wants us to depart from our long-standing precedent, eliminating judicial review of its CM decisions entirely. It asks that we abandon an established constitutional remedy, the writ of habeas corpus, which is "granted freely and without cost" and "shall never be suspended," article I, section 13, Florida Constitution, because using it in the CM context is a "diminution of the Great Writ that must end."[10] The Department says that the status quo "may have made sense years ago when little was known about the conditions of CM units and allegations of arbitrary placement abounded." Judicial review of CM challenges should be eliminated, we are told, because CM processes have evolved and become so "modern" as to operate independently of the judicial branch without fear that abuses in prison will occur.

---

[10] Sight should not be lost that the writ was originally judicially-created specifically as "an instrument by which [judges] supervised imprisonment orders made anywhere, by anyone, for any reason." Paul D. Halliday, Habeas Corpus: From England to Empire 9 (Harvard University Press 2010). It exists as the quintessential writ by which judges are to hear the pleas of any and all who are imprisoned.

The claim that judicial precedents over the past decades justify overruling our caselaw has no support whatsoever. Nothing in the Florida or United States constitutions has changed; no case from the United States Supreme Court or the Florida Supreme Court in the past thirty-five years suggests that our precedents on this topic should be abandoned; and decisions of our sibling courts are in accord with our precedents. Indeed, no court nationwide has done what the Department asks us to do.

The entire linchpin of the Department's theory is <u>Sandin v. Conner</u>, 515 U.S. 472 (1995), a twenty-year-old decision that limited—but did not eliminate—judicial review of disciplinary challenges. <u>Sandin</u> specifically left open review where an institution imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." <u>Id.</u> at 484. Courts nationwide have cited <u>Sandin</u> 16,628 times, but none have read it as ushering in the elimination of judicial review of CM-type assignments. The Department also cites a smattering of cases that purportedly support the total elimination of an inmate's liberty interest in the CM context, but none specifically do so; and the cases are either unpublished, non-precedential, or they merely support the general concept from <u>Sandin</u> that only atypical and significant conditions create a protectable interest.

Moreover, though debate exists on the baseline of <u>Sandin</u>'s standard,[11] no debate exists on its application; courts have routinely applied it to decide whether a prison placement falls within its parameters. The United States Supreme Court has done so. <u>See, e.g.</u>, <u>Wilkinson</u>, 545 U.S. at 223 (concluding that "assignment to [Supermax prison] imposes an atypical and significant hardship under any plausible baseline"). And, indeed, we've applied it a number of times and found it workable. <u>See, e.g.</u>, <u>John v. Crews</u>, 149 So. 3d 149, 151 (Fla. 1st DCA 2014) ("Based on <u>Sandin</u>, appellant's placement in disciplinary confinement for forty-three days did not present an atypical, significant deprivation implicating the protections of the due process clause.").

Simply said, no precedent supports a deviation from stare decisis; no flawed logic has been shown; and recasting the status quo in another form serves no purpose. Our precedents have not thrust us into "improper judicial second-guessing" of governmental actions, whether dangerous or otherwise, as the Court believes; nor have they—as the Court claims—"encourage[d] excessive state judicial oversight and interference with prison management, without any real substance at stake or real benefit conferred on state prisoners while creating a risk of diminishing state prison security and safety." Maj. Op. at 17. Not a single

---

[11] <u>Wilkinson v. Austin</u>, 545 U.S. 209, 223 (2005) ("In <u>Sandin</u>'s wake the Courts of Appeals have not reached consistent conclusions for identifying the baseline from which to measure what is atypical and significant in any particular prison system.").

instance has been brought to our attention to support the claim that the judges of this Court or any other have acted improperly or, through excessive oversight, interfered with prison operations for no good reason.

And no "changed circumstances" warrant the exercise of en banc powers to overturn our caselaw. While it is highly laudable that Florida's prison system has adopted additional rules, procedures, and protocols for CM assignments, which are said to be solely non-punitive management tools, that does not logically mean that courts should fold up their tents and forego judicial review, particularly under separation of powers principles. Courts exist to protect rights, and no law or tradition exists to abdicate that responsibility absent the most compelling of justifications. We are in the business of reviewing governmental actions that may impinge on people's rights; administrative deference, not judicial abdication, is what's due.

What's more, the United States Supreme Court has made clear that the determination of an inmate's liberty interest is not based solely on what state regulations say (or how numerous and dense they are), but on the nature of prison conditions imposed relative to prison life generally. The Court explained this point as follows:

> After Sandin, it is clear that the touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is not the language of regulations regarding those conditions but *the nature of those*

59

> *conditions themselves 'in relation to the ordinary incidents of prison life.'*

Wilkinson, 545 U.S. at 223 (citation omitted) (emphasis added). Thus, contrary to the Department's (and the Court's) view that inmates "do not have a liberty interest in their custody status while in prison," it is clear they do, albeit more narrowly circumscribed. We are in no position to overrule the United States Supreme Court on this point. And the high court has clearly said that facial readings of prison regulations are not the touchstone; instead, it is the nature of the actual conditions imposed. This makes sense because of the improbability of a state promulgating prison regulations that facially impose atypical, significant restrictions.

A few final observations. First, the Court concedes that by overturning long-standing precedent it creates conflict with our sibling courts and potentially our supreme court. The result is a judicial outlier in a sea of precedent to the contrary; no court anywhere has read Sandin as does this Court. We will be seen as straining to squeeze juice from Sandin's timeworn rind, overplaying its significance, and altering our caselaw for no good reason. Second, the Court's lengthy opinion and new-fangled remedy, much like a Rube Goldberg machine, are over-engineered to perform what has been a simple, uncomplicated, and non-controversial task; they will likely create unnecessary confusion and have the unintended consequence of increased prisoner litigation. It is said the new remedy specifically does not displace existing review via a petition for a writ of habeas corpus based on prison

60

conditions in the CM system. Thus, inmates will now file *two* petitions, one seeking mandamus to review the CM placement decision, and another seeking a writ of habeas corpus to review the conditions of CM. This will undoubtedly result in more burdens on judicial administration, not fewer. And prisoners who pursue the new remedy, if indigent, as most are, will impose further burdens due to the process and paperwork necessary to waive filing fees in this new class of cases. Finally, courts have a role to play in making the law understandable and efficient; we accomplish neither in this case. If it ain't broke, don't fix it.